(159 App. Div. 160)

## LEWIS v. CITY OF UTICA.

(Supreme Court, Appellate Division, Fourth Department. October 1, 1913.)

1. PUBLIC LANDS (§ 188*)—ENGLISH CROWN GRANTS—COMMON LAW—APPLICABILITY.

A grant made by the English crown must be construed under the common law of England, where for over 60 years prior to the grant no other sovereignty had exercised any dominion in that territory.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 601–611; Dec. Dig. § 188.*]

2. NAVIGABLE WATERS (§§ 36, 37*)—BED OF STREAMS—OWNERSHIP—CONVEYANCE.

At common law the title to the bed of navigable arms of the sea and navigable rivers was in the king, and he could dispose of his rights without hindrance, but he held the navigable waters as sovereign and not in an individual capacity, the bed of the stream being his jus privatum, the stream itself being jus publicum; and hence the king had authority to convey the bed of a navigable stream in the territory of New York, even though it be considered a navigable stream.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–226, 285; Dec. Dig. §§ 36, 37.*]

3. NAVIGABLE WATERS (§ 1*)—WHAT CONSTITUTES—"NAVIGABLE."

A fresh-water stream in colonial territory in which the tide did not ebb and flow, and which was not an arm of the sea, was not a navigable stream at the common law.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 5–16; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 5, pp. 4675–4684; vol. 8, p. 7728.]

4. WATERS AND WATER COURSES (§ 155*)—CONVEYANCES.

A fresh-water stream within the bounds of a grant of land passes to the grantee when it is not a navigable stream.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 161–166; Dec. Dig. § 155.*]

5. COURTS (§ 92*)—DECISION—DICTA—STARE DECISIS.

Dicta of decisions rendered a century later than the grant in suit cannot be considered controlling under the principle of stare decisis.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 335; Dec. Dig. § 92.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. NAVIGABLE WATERS (§ 37*)—LANDS UNDER WATER—GRANT.

    While it is presumed that riparian owners on the Mohawk and Hudson rivers do not, as is usual, take title to the bed of the stream, because such streams constitute a great water highway across a large portion of the state, that rule does not prevail where the bed of the stream has been granted by the British crown before American independence.

    [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. § 37.*]

7. WATERS AND WATER COURSES (§ 155*)—CONVEYANCE—CONSTRUCTION.

    When a patent or grant conveys a tract of land by metes and bounds, the land under water as well as other land will pass.

    [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 161–166; Dec. Dig. § 155.*]

8. NAVIGABLE WATERS (§ 37*) — LANDS UNDER WATER — CONVEYANCE — CONSTRUCTION.

    A grant of land situated on both sides of the Mohawk river, which was described as a quadrangle through which the stream ran, made by the British sovereign before American independence, carries with it the bed of the stream.

    [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. § 37.*]

    Kruse, P. J., and Robson, J., dissenting.

Appeal from Trial Term, Oneida County.

Action by Mary Lewis against the City of Utica. From a judgment for defendant, plaintiff appeals. Reversed and remanded, with directions.

Argued before KRUSE, P. J., and ROBSON, FOOTE, LAMBERT, and MERRELL, JJ.

Theodore L. Cross, of Utica, for appellant.

Seward A. Miller, of Utica, for respondent.

MERRELL, J. This action is in ejectment, plaintiff alleging that she is the owner and entitled to the possession of a small parcel of land that formerly constituted a part of the bed of the Mohawk river and now situate within the corporate limits of the city of Utica. The defendant, the city of Utica, is in possession of the lands claimed by plaintiff; said city claiming title thereto and the right to the exclusive possession thereof. Plaintiff claims title and bases her right to possession of the disputed premises upon a certain grant made in 1734 by King George II of Great Britain, through the English colonial government in the province of New York to Joseph Worrell and others, by deed or letters patent, dated January 2, 1734. This grant was known as Cosby's Manor, taking its name from the then English Colonial Governor of New York, and prefixed to the grant is the certificate of Gov. Cosby and the other officers of the colonial government recommending the grant and describing the lands so to be conveyed as a part of a larger tract or parcel of land. The larger tract or parcel of land is referred to as follows:

"All that tract of land in the Mohawks country on both sides of the river between the Great Fflatt or Plain above the fall and the land granted to the wife and children of John Jurck Kast as also another tract of land beginning

on the west side of the said granted lands on both sides of the said river running up westward to a certaine Creek called Sadahqueda and in breadth in the woods on both sides of the said river six English miles."

The tract or parcel of land conveyed is described in such certificate and also in the grant or letters patent proper in substantially the same words and the following is the description as recited in the letters patent:

"A certaine tract or parcel of land scituate lying and being in the county of Albany on both sides of the Mohawks river beginning at a certaine place on the south side of the said Mohawks river and the west side of a brook called Sedaghqueda where the said brook falls into the said river and runs thence south thirty-eight degrees west two hundred and thirty-eight chains then south fifty-two degrees east four hundred and eighty-three chains then north thirty-eight degrees east four hundred and eighty chains then north fifty-two degrees west four hundred and eighty-three chains and then south thirty-eight degrees west two hundred and forty-two chains to the place where the same tract began containing twenty-two thousand acres of land and the usual allowance for highways," etc.

Then following the usual words of a grant, the tract or parcel of land conveyed is described as follows:

"All the said tract or parcell of land so set out as aforesaid and so abutted bounded and described as is above expressed concerning the same containing in the whole twenty-two thousand acres of land besides the usuall allowance for highways together with all and singular the woods underwoods trees timbers feedings pastures meadows marshes swamps ways waters water courses rivers brooks rivulets runs and streams of water ponds pools fishings fowlings hunting and hawking mines and minerals whatsoever (except gold mines and silver mines)," etc.

The plaintiff traces her title from said Cosby's Manor grant through various mesne grantors to herself.

As before stated, the disputed territory formerly was a part of the bed of the Mohawk river and became valuable as land only upon the course and channel of the said river being recently changed, and through certain legislative enactments whereby it is claimed that the abandoned bed of the Mohawk river, including the disputed parcel, became the property of the city of Utica.

Prior to March 20, 1891, the disputed premises were within the bounds of the town of Deerfield, Oneida county. On said last-mentioned date a statute became effective bringing the said premises within the corporate limits of the city of Utica. On the same date legislation was enacted and became effective straightening the Mohawk river and thereby changing its course to a location about a half a mile northerly from the locus in quo, thus leaving the old channel, including the disputed premises, dry land. By virtue of the aforesaid legislation and through chapter 579 of the Laws of 1901 and chapter 131 of the Laws of 1907, the city of Utica succeeded to whatever title and interest the state of New York had in the bed of the old channel of the river, including the locus in quo. It must be admitted that it was the intent of the Legislature and that the legislation above mentioned was appropriate and sufficient to convey to the city of Utica any title which the state of New York had to the old river channel at the time said several acts were passed. But the real issue is as to whether the state then

had any interest which it could convey; whether or not the crown by its Cosby's Manor grant above mentioned had granted the bed of said river to plaintiff's predecessor in title.

Upon the trial of this action the learned trial justice held that, at the time of the grant of Cosby's Manor by King George II of Great Britain, the jus privatum or title to the bed of the Mohawk river reposed in the king, subject to the jus publicum or right of the public to use the same and the water for all proper purposes of navigation, and therefore that the king had the clear right to include in his grant the bed of the river subject to the public use of the stream flowing over said bed. To that extent the learned trial justice sustained the contention of the plaintiff, but denied her the relief which she seeks by this action, upon the sole ground that said Cosby's Manor grant, under the interpretation and construction of the learned trial justice, did not convey the bed of said river, and that the same eventually came to the people of the state of New York, who succeeded to all the rights of Great Britain at the close of the Revolutionary War.

It therefore seems to me that this appeal presents two questions for our determination. First, was the title to the bed of the Mohawk river on January 2, 1734, in King George II of Great Britain, with power to grant and convey the same; and, second, did the king, by the letters patent above referred to, convey the bed of said river, including the parcel in dispute, to Joseph Worrell, plaintiff's predecessor in title?

In the orderly disposition of this case, we will consider these questions in the order named.

[1-4] As to the title of the crown of England to the bed of the Mohawk river, it will be observed that at the time of this grant and for more than 60 years there had been no dominion or sovereignty over any of the territory through which the Mohawk river flowed, except that of Great Britain, and therefore the common law of England must be deemed as controlling the grant under this particular patent. Under the English common law the title to the bed of all navigable arms of the sea and navigable rivers throughout the kingdom was in the king. Such lands under water were his private property, which he could dispose of as he saw fit without restraint or hindrance from the law. These lands under said waters were known as the jus privatum and were held and conveyed by the king in his private individual capacity. The navigable waters themselves the king held as sovereign, but not in an individual capacity. He was trustee thereof for the public and said waters were not subject to private ownership, nor were they subject to grant, being jus publicum. The jus privatum or king's title to the bed of the navigable waters in his kingdom was always subject to the jus publicum or right of the public to use the same and the waters thereupon. Lewis Blue Point Oyster Cultivation Co. v. Briggs, 198 N. Y. 287, 91 N. E. 846, 34 L. R. A. (N. S.) 1084, 19 Ann. Cas. 694.

The Mohawk river is a fresh-water stream, and, while to some extent navigable, it is not an arm of the sea, nor does the tide ebb or flow thereon. It is difficult to appreciate how the king at the time of granting these letters patent could have regarded the Mohawk river as being an arm of the sea or navigable river where the tide ebbs and flows.

If it did not occupy the status of such waters in England, then the public had no rights therein, and the bed of said river passed to the patentee under said grant as the bed of a fresh-water stream within the bounds of the grant. Rogers v. Jones, 1 Wend. 237, 19 Am. Dec. 493; Trustees of Brookhaven v. Strong, 60 N. Y. 56.

At an early day the courts of our state gave to the Hudson river above tidewater and the Mohawk river the character of navigable waters and extended to such fresh-water streams the law applicable to arms of the sea and navigable rivers of England where the tide ebbs and flows. Assuming the soundness of such doctrine, the title to the bed of such navigable waters was, at the time of this grant, in the king as jus privatum, subject to conveyance by him, while the use of the waters remained with the public as jus publicum and was inalienable. The cases of People ex rel. Loomis v. Canal Appraisers, 33 N. Y. 461; Crill v. City of Rome, 47 How. Prac. 398; People v. Page, 39 App. Div. 110, 56 N. Y. Supp. 834, 58 N. Y. Supp. 239; Lee v. Childs, 140 App. Div. 699, 125 N. Y. Supp. 571; and others which in effect hold that the title to the bed of the Mohawk river is in the people of the state—are invoked in support of defendant's position. I do not think those decisions authorities which are controlling in the case at bar. Those decisions may be attributed to Dutch occupation, at which time the civil law obtained, and under which the title to the bed of all navigable streams was in the government. Canal Appraisers v. People, 17 Wend. 571, 573.

The civil law prevailed in the Netherlands during the occupancy of the Dutch. The courts have therefore concluded that, in all cases along the Mohawk and Hudson rivers in which the original patents were derived from the Dutch government, the beds of those rivers were not thereby conveyed, but passed from the Dutch to the English and from them to the state of New York at the close of the Revolution. As stated in the able opinion of Judge Gray in Fulton Light, Heat & Power Co. v. State of New York, 200 N. Y. 400, at page 413, 94 N. E. 199, at page 202 (37 L. R. A. [N. S.] 307):

"The part of the Hudson river above the ebb and flow of the tide and the Mohawk river, a fresh-water stream, in grants made to settlers under the Dutch government, were excepted and, upon the English succession, the beds of those waters, never having been conveyed, vested in the crown, as lands not theretofore granted."

[5] Thus it seems clear to me that the crown of England, having obtained by the Dutch cession the bed of the Mohawk river, thereafter held the same as his individual property and had a clear right to grant and convey the same. If he did by the Cosby's Manor grant convey to plaintiff's predecessor in title the bed of said stream, then the people of the state could never have receivd title thereto, because the same had been cut off by said grant long prior thereto.

Indeed, many of the decisions holding that the title to the bed of the Hudson river above tidewater and of the Mohawk river was in the people of the state were in cases arising under Dutch grants. The grant of Cosby's Manor was an English grant made long after the termination of Dutch rule in New York, and it seems to me that the com-

mon law of England should govern rather than the civil law. Nor do I believe that the dicta of decisions made a century and over after the granting of letters patent should be regarded as controlling under the doctrine of stare decisis. In none of those cases, except the Lee Case, was the same patent involved as is in the case at bar. In that case I think the referee erroneously held that the title to the bed of the river could not have been conveyed by the crown. That the crown then had the power to so convey seems indisputable.

I am therefore of the opinion that at the time of the grant in question the king of Great Britain had the right to grant the bed of the Mohawk river.

[6] Under the construction given by the courts of this state concerning conveyances of land along the Mohawk river, it is to be presumed that the title to the bed of the stream does not reside in the riparian owner unless it appears from the original grant or patent under which such owner claims that it was the clear intention of the sovereign to convey the bed of the stream. Canal Appraisers v. People ex rel. Tibbits, 17 Wend. 571, 574. And in such event the public are deemed to have the full right to enjoy the waters of the Mohawk river for the purposes of navigation, including the right to divert the waters of the stream for navigation outside of its natural bed.

I have found no case which presumed to take from an owner having a clear grant of the bed of the Mohawk from the English crown the title thereto. Even in the case of People ex rel. Loomis v. Canal Appraisers, 33 N. Y. 461, at page 500, Judge Davies recognizes the validity of a positive grant of the bed of a navigable river, as against the state, and in discussing the Kempshall Case, 26 Wend. 404, involving the bed of the Genesee river, concededly a navigable stream, makes use of this significant language:

"There was evidence of a positive grant such as would convey the fee of the bed of a navigable river where the tide ebbed and flowed. Such being the fact in that case, it, beyond all dispute, carried the case in favor of Kempshall."

Kempshall was claiming through a grant which included the bed of the Genesee river.

In the absence of an absolute grant and with regard to such portions of the beds of the Hudson below and above tidewater and of the Mohawk river as had not been actually granted by the crown before the title came to us, it was perhaps not unreasonable that the courts should establish with reference to riparian owners along said streams a differerent rule than that applicable to riparian owners along other freshwater streams. These two streams constituted the great water highway across a large portion of the state, and it was not unreasonable to establish the rule that grantees would be presumed to take no title to the bed of the stream, but that the title thereto should remain in the people, whereas grantees along other fresh-water navigable rivers would be presumed to take title to the centers or threads of the streams. But no such rule can be applicable to such part of the beds of said streams as were absolutely granted prior to American accession and in which the people of the state never had any interest. Smith v. Bartlett, 180 N. Y. 360, at page 365, 73 N. E. 63.

But regardless of the suggestion last made, I am of the opinion that the crown at the time of granting the letters patent in question had ample power to convey the bed of the Mohawk river, including the locus in quo, and that, if the letters patent actually granted the bed of said stream along with other lands conveyed, at no time thereafter did the people of the state have or acquire any interest therein.

[7, 8] This brings us to the construction of the grant under which plaintiff claims. In the grant the lands are described as follows:

"A certaine tract or parcel of land scituate lying and being in the county of Albany on both sides of the Mohawks river beginning at a certaine place on the south side of the said Mohawks river and the west side of a brook called Sedaghqueda where the said brook falls into the said river and runs thence south thirty-eight degrees west two hundred and thirty-eight chains then south fifty-two degrees east four hundred and eighty-three chains then north thirty-eight degrees east four hundred and eighty chains then north fifty-two degrees west four hundred and eighty-three chains and then south thirty-eight degrees west two hundred and forty-two chains to the place where the same tract began containing twenty-two thousand acres of land and the usual allowance for highways," etc.

It will thus be noted that the land described is in form almost a square, being a rectangle 483 chains on one side by 480 chains on the other, making 231,840 square chains or 23,184 acres in the tract. After deducting for the "usual allowance for highways" the customary 5 per cent., or a little over 1,159 acres, we have an excess of less than 25 acres over the number of acres mentioned in the grant, so remarkably close as to at once give the impression that in making a grant of wild lands of such magnitude the acreage of 22,000 was an approximation. Again, it will be observed that the description starts on the south side of the Mohawk river and the west side of a brook called Sedaghqueda where said brook falls into the said river, and then is described a rectangle the northerly and southerly sides of which were 483 chains in length and the easterly and westerly sides being 480 chains in length. Both the easterly and westerly lines cross the Mohawk river. That the grantor intended to convey the bed of the river is clearly shown by the final line running from the northwesterly corner "two hundred forty-two chains to the place where the same tract began." This line crossed the river and added to the first line in the description, 238 chains, makes the westerly line 480 chains in length, the same as the easterly line.

Following the usual words of a grant, the lands conveyed are described as follows:

"All the said tract or parcell of land so set out as aforesaid and so abutted bounded and described as is above expressed concerning the same containing in the whole twenty-two thousand acres of land besides the usual allowance for highways together with all and singular the woods underwoods trees timbers feedings pastures meadows marshes swamps ways waters water courses rivers brooks rivulets runs and streams of water ponds pools fishing fowlings hunting and hawking mines and minerals whatsoever (except gold mines and silver mines)," etc.

Considering the acreage conveyed and upon a fair interpretation of the language of the grant, I am convinced that the grantor intended to include in his conveyance the bed of the Mohawk river.

The courts, moreover, have long since set at rest any question as to lands under waters included within the bounds of a grant being thereby conveyed. In the leading case of Rogers v. Jones, 1 Wend. 237, at page 255 (19 Am. Dec. 493), Woodworth, J., thus lays down the rule:

"It cannot be doubted that, when a patent or grant conveys a tract of land by metes and bounds, the land under water as well as other land will pass, if the land under water lies within the bounds of the grant."

See, also, Trustees of Brookhaven et al. v. Strong, 60 N. Y. 56, at bottom of page 71. This doctrine is recognized in De Lancey v. Piepgras, 138 N. Y. 26, at page 36, 33 N. E. 822.

It therefore seems not only a reasonable construction of the language used in the grant, that the crown intended to convey the bed of the stream along with the lands described as "on both sides of the Mohawks river," but, having included said river within the bounds of the grant under the decisions mentioned, the grant must be deemed to have conveyed the bed of said stream. I am therefore of the opinion that the plaintiff is entitled to the relief which she seeks in this action, and that the judgment of the court below should be reversed. In conformity with the requirements of section 1317 of the Code of Civil Procedure, as recently amended, the findings of fact found by the trial court, numbered 2 to 9, inclusive, should be stricken out, and in place thereof the order of reversal should contain findings of fact substantially conforming to those contained in plaintiff's proposed decision numbered from 1 to 9, inclusive; the order to be settled on two days' notice.

Judgment reversed, and judgment directed in favor of the plaintiff, with costs in this court and the court below to the plaintiff. The findings of fact numbered 2 to 9, inclusive, as found by the trial court, are disapproved and stricken out, and in place thereof findings are made by this court substantially conforming to those contained in plaintiff's proposed decision numbered from 1 to 9, inclusive. Settle order before Mr. Justice MERRELL, on two days' notice.

All concur, except KRUSE, P. J.; and ROBSON, J., who dissent in an opinion by KRUSE, P. J.

KRUSE, P. J. (dissenting). I concur with Mr. Justice MERRELL, that, if the Mohawk river bed is included in the Cosby Manor grant, the city of Utica acquired no title thereto from the state; but I am of the opinion that under the rule of law as declared by the Court of Appeals in the case of People ex rel. Loomis v. Canal Appraisers, 33 N. Y. 461, peculiarly applicable to the Hudson and Mohawk rivers, the language contained in the letters patent is not sufficiently specific to cover the title to the bed of the river. While that decision has been many times referred to, I am not aware that the decision or the learned and exhaustive opinion has ever been questioned. No such distinction as is now sought to be made between a Dutch grant founded upon the civil law and an English grant founded upon the common law is therein made. Indeed, it is very apparent from a reading of the opinion that if the common law of England had been strictly adhered to the decision would not have been made in favor of the state. It is therein

expressly declared that the common law of England was only adopted in our state so far as it was applicable to our conditions.

While I might reach a different conclusion if the question were an open one, it seems to me that the Loomis Case is controlling. I therefore vote for affirmance.