Borst, J.
The plaintiff is the owner of a farm located a short distance southerly of Fort Edward on the westerly bank of the Hudson river. The defendant owns a manufacturing plant on the easterly side of the river two miles below the farm of the plaintiff. The latter contends that the defendant has, by means of a dam, known as the “ Fort Miller dam,” which it has caused to be erected across the river opposite its plant, raised the water in the river so that at times it overflows some thirty acres of land in plaintiff’s main farm and about three acres of her land on an island in the river opposite the main farm and at a point in the river known as “ Crocker’s Reef.” The plaintiff seeks in this action to compel the removal of the dam and the recovery of damages.
Much of history, legislative and judicial, has been *479 written with reference to the various dams located in the Hudson river at this point. By chapter 43, Laws of 1804, the defendant’s predecessor in title received from the state the right to erect, on the east side of the Hudson river at the point in question, a wing dam, but “ that it shall not be lawful to extend such dam so far into said river from the east bank as the late dam extended by thirty feet.” This right, so far as the evidence shows, has never been lost to defendant and its predecessors in title. As the dam was limited to the east side of the river, it obviously gave no right beyond the center of the river or what might be properly urged as its east side. No evidence is given tending to show how far the dam referred to in the act as the “ late dam ” extended into the river. Defendant’s counsel, however, states in his brief that the dam erected from the east side, pursuant to the act, was on the site of the present dam and extended very nearly to the center of the river. From the time of the passage of this act the different dams located at this place have been the subject of attention and are noted in New York Canal History published by authority of the state, reports of the canal board, and numerous acts of the legislature, which it is not deemed necessary to enumerate.
At one time the state maintained a dam at the point in question but whether it utilized the wing dam of the defendant’s predecessors in title from the east shore is not clear. The latter evidently had some rights in the maintenance of the state dam as there appears'from the canal reports to have been paid to them by the state, when the state dam was removed or abandoned, a considerable sum of money as damages claimed to have been sustained by them by the removal of the state dam. Damages were also paid by the state to other people whose lands were affected by the erec *480 tion and maintenance of the state dam. In Harris v. Thompson, 9 Barb. 350, some of the history of the numerous assaults made upon the dams at this place by the upper riparian owners is given.
The defendant bases its right to maintain the dam in the river upon two patents and the Vandenburgh deed, which are now considered. The defendant’s mills and easterly end of its dam are located within the bounds of the tract of land known as the “ Schuyler Patent,” granted by George II to Johannes Schuyler and others, July 18,1740. The material portion of the description in that patent, so far as the present case is concerned, is that which relates to its westerly boundary and reads “ then down the stream of the said river (including six islands lying in the said river opposite to this tract) to the place where this same tract of land first began.”
As the place of beginning in the description in the patent was at the bank of the river, the words “ then down the stream of the said river,” it is evident, refer to the bank of the river, that is, along the stream of the said river. Otherwise, the description would not come back to the place of beginning. Applying the rule that in the construction of such a patent that must prevail which is most favorable to the state (People v. N. Y. & Staten Island Ferry Co., 68 N. Y. 71, 77; West Virginia Pulp & Paper Co. v. Peck, 189 App. Div. 286), it must be held that the defendant owns no part of the river bed on its easterly shore.
The westerly portion of the dam is located in the Kayaderossoras patent granted by Queen Anne to Naning Harmense and others, November 2, 1708. The descriptive language of this patent, in so far as material here, is “ thence along the said river down southerly'to the northeasterly bounds of Sarachtoga.” This description clearly excludes the bed of the river.
*481 In July, 1882, defendant’s predecessors acquired by deed from Nicholas Vandenburgh, riparian owner on the west side above the Harris dam hereafter referred to, and in the Kayaderossoras patent, “ the right to build a dam across said river, or any part of it, opposite the said farm, (Vandenburgh) and to abut the same against the west bank of said river on said farm and to keep and maintain the same there forever.” In this deed appears the following recital: “ whereas the parties of the second part own certain real estate and riparian rights upon the east side of the Hudson River nearly opposite and south of the Vandenburgh farm.” In this is a concession by defendant’s predecessors in title that their ownership was confined to the east side of the river. It is not claimed by the Vandenburgh deed that the defendant or its predecessors obtained any right to dam the river as against the plaintiff or her predecessors in title.
The Hudson river at the place in question is a navigable stream and while plaintiff had the right to the use of its waters as' an incident to the ownership of its bank and with the consent of the state to maintain a dam in its bed, it had no right to dam its waters to the prejudice of the plaintiff. Harris v. Thompson, supra; West Virginia Pulp & Paper Co. v. Peck, supra; United Paper Board Company v. Iroquois Pulp & Paper Co., 226 N. Y. 38; Smith v. City of Rochester, 92 id. 463; People v. Page, 39 App. Div. 110; City of Rochester v. Erickson, 46 Barb. 92; Adams v. Popham, 76 N. Y. 410.
It must, therefore, be held that defendant, under the evidence presented, has no title to the bed of the river and that its right to maintain a • dam in the river is confined to its easterly half, which rests upon the permission of the state given by the act of 1804.
Since about the year 1861, the situation with refer *482 ence to the dams at the point in question has been as follows: On the west side, Harris and Burt had built a wing dam extending from their mill diagonally up the river some three or four hundred feet and to within a few feet of the center of the river and very nearly up to the present dam. On the east side, Nichols, defendant’s predecessor in title, had a wing dam extending very nearly to the center of the river and on the site of the present dam. The river ends of the two dams were a short distance apart, that from the easterly side being twenty to forty feet furthest up the stream. The river channel was then, and is now, much the deepest at the east side of the river. Later, the Harris wing dam was carried away and has never been rebuilt.
After the conveyance from Vandenburgh and in the year 1882, the defendant’s predecessor extended their easterly wing dam to within thirty feet of the west shore. This extension, however, for some distance from its westerly end consisted of one log, ten or twelve inches high, bolted to rocks underneath. This extension did not materially affect the lands of the plaintiff in the main farm, although it may have slightly affected the head in plaintiff’s water power at Crocker’s Beef.
About the year 1894, the defendant raised the westerly half of the dam an additional eighteen inches, bringing its crest up to a level with the easterly half and it is against this that the plaintiff particularly objects and asks that it be removed. No complaint is made that the easterly half of the dam has been raised. The crest of the present dam is given by the engineer witnesses as about 115 feet above tide water. In support of defendant’s contention that the westerly half of the dam has not been raised, it produces a map annexed to Assembly Document 27, of 1876, which *483 purports to give the height of the Fort Miller dam as 115.076 and urges that this is proof that from 1876 to the present time there has been no change in the height of the dam. As it is not contended that the easterly half of the dam has been raised, it may well be that the datum found on the map of 1876 was taken by the engineers who made it from the crest of the easterly half of the dam as the crest of the westerly half was then much lower than the easterly half and irregular. Plaintiff’s land affected by the raise of the dam is at an elevation three to seven feet higher than the crest of the dam. It is urged on the part of the defendant that even though the dam has been raised eighteen inches, it does not flood the lands of the plaintiff but with this, however, I am not able to agree.
Many elements undoubtedly affect the situation, such as the slope of the river, and its changes at different stages in its flow, a bend in the river between the dam and the farm and the difference in its width at the two points. As to the effect of many of these elements in raising the water upon the lands of plaintiff, experts testified, but differed widely. It is difficult to differentiate between the water which backed on plaintiff’s lands, because of the raise of the dam eighteen inches and that which came from the floods in the river irrespective of the dam. There were times, however, when the dam undoubtedly caused the water to pass upon and stand upon the land when it would not otherwise have done so except for the dam, and this to plaintiff’s damage. The raising of the dam, therefore, caused a trespass against the plaintiff and for that she is entitled to relief. This leaves us to a consideration of the remedies which should be afforded plaintiff. She should recover her damages for the six years prior to the commencement of this action and as the action is in equity, she is entitled to recover her damages to *484 the present time, which may fairly be fixed at $1,400. Kilbourne v. Supervisors of Sullivan County, 137 N. Y. 170; Gerow v. Village of Liberty, 106 App. Div. 357. It may not be assumed from the evidence that the plaintiff lost the use of her land each year during the period named in its entirety and I have therefore fixed the damages with this in view.
Plaintiff, however, seeks, in addition to damages, injunctive relief. This form of relief does not necessarily follow the granting of damages. McCann v. Chasm Power Co., 211 N. Y. 301; Whalen v. Union Bag & Paper Co., 208 id. 1. The legal cause of action is that on which the equitable cause is founded. A defense good against the former bars the latter. It does not follow that because damages are allowed in an equity action, an injunction should issue. The rule which requires a trespasser to undo as far as possible what he has wrongly done is not rigid. There are many exceptions. In the Whalen case Judge Werner writing the opinion said: “It is not safe to attempt to lay down any hard and fast rule for the guidance of courts of equity in determining when an injunction shall issue.”
The legal rights of the parties in this case will be defined and secured by the judgment for damages. If the defendant continues to maintain the dam at its present height, plaintiff may recover her damages for future injuries, if any, as they occur. Galway v. Metropolitan Elev. R. Co., 128 N. Y. 132; Pappenheim v. Metropolitan E. R. Co., Id. 436.
Defendant’s manufacturing plant, which is run by the water power from this dam, has been gradually extended from a small industry until it now represents an investment of $100,000 or more, employs some fifty men and makes about 3,500 tons of paper yearly. From 1894 until the commencement of this action in *485 1912, plaintiff must have known of this development and that the growth and success of defendant’s plant depended upon the water from the dam. She made no objection against this addition to the dam until about the time of the bringing of this action, some eighteen years thereafter. Defendant’s claim to maintain the dam as at present located and at its present height is not entirely without basis. A layman might well assume that the act of 1804, the two patents and the Vandenburgh deed, gave the right to the construction of the dam across the entire bed of the river, and reputable men, called as witnesses, differed as to whether the dam at its present height caused damage to the plaintiff’s land.
The value of the land per acre flooded by the dam as raised in 1894 is not given separately from that fixed as the value of the entire farm. From the photographs, the view taken with counsel of the locus, and the evidence given as to the value of the entire farm, the permanent depreciation in its value from the effects of the dam, if continued at its present height, may fairly be determined to be $2,000. In fixing this amount it is considered that the land is not taken and that some benefit is to be derived therefrom. The damage to the island is covered by an appropriation made by the state and need not, therefore, be considered. The plaintiff may not be required to take the permanent damages fixed by the court nor may the defendant be required to pay such damages in this action. The amount has been fixed to give the parties opportunity, assisted by the judgment of the trial court if they so elect, to settle the entire controversy for the future. It is not a case where great public interests are involved nor one where the defendant has the power to acquire the right to flood the plaintiff’s property under the power of eminent domain nor where *486 the rights of the parties as originally fixed have been changed and the objects and purposes of those rights entirely destroyed. If it came within either of these cases, the court might properly fix the terms upon which the defendant could acquire such right but not otherwise. Pappenheim v. Metropolitan E. R. Co., supra; Amerman v. Deane, 132 N. Y. 355; Strobel v. Kerr Salt Co., 164 id. 303; Knoth v. Manhattan R. Co., 187 id. 243; 2 Beach Mod. Eq. Juris. 726. This case differs from those brought to restrain the creation of noxious vapors injurious to the health of people or the pollution of streams of water that endanger the lives of cattle drinking it. No injurious results flow from the maintenance of the dam at its present height so far as appears except that to plaintiff’s lands.
The plaintiff lived on her farm from 1867 until after the raising of the dam. She must have known of the change that was made in the dam in 1894. Certainly if any change in the set back of the river to her damage came at that time, she must have known of it. She is not estopped because of her knowledge of the situation during the eighteen years that she remained silent and without complaint while the defendant proceeded to develop and increase its plant, based upon the increase in power which it received from the raise of the dam and which inured not only in benefit to the defendant, but also to the public. This silence on her part may well be considered and its effect upon the defendant’s conduct in determining the relief to be afforded plaintiff as she appeals to the equitable powers of the court. The defendant acquired no prescriptive right during that period against the plaintiff. There is no continuous flooding of the latter’s lands by reason of the raise of the dam. It may come for periods each year and it may not come at all.
The plaintiff should have judgment for $1,400, the *487 amount of her damages to the present time, but without an injunction, with the right to her to apply at any time at the foot of the judgment for an injunction requiring the defendant to lower that part of the dam raised in 1894 eighteen inches upon showing that the situation is changed and that the ends of justice require it or as the court may direct, or at her election plaintiff may bring such separate action for such or other relief as she may be advised on account of any injury to her property hereafter.accruing.
Judgment accordingly.